Mandour & Associates, APC
Ben T. Lila (SBN 246808)
Email: blila@mandourlaw.com
Gordon E. Gray (SBN 175209)
Email: ggray@mandourlaw.com
8605 Santa Monica Blvd., Suite 1500
Los Angeles, CA 90069
Telephone: (858) 487-9300
Attorneys for plaintiff,
Doctor's Financial Network, Inc.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| Doctor's Financial Network, Inc., a California corporation, | **Civil Case No. 2:22-cv-02149** |
| Plaintiff, | **PLAINTIFF DOCTOR'S FINANCIAL NETWORK, INC. AND THIRD-PARTY DEFENDANT CHARLES KRUGH'S STATEMENT OF DISPUTED MATERIAL FACTS** |
| v. | |
| DrDisabilityQuotes.com, LLC, a New Jersey limited liability company, | |
| Defendant. | |
| | |
| DrDisabilityQuotes.com, LLC, a New Jersey limited liability company, | |
| Counterclaimant and Third-Party Plaintiff | |
| v. | |
| Doctor's Financial Network, Inc., a California corporation, | |
| Counterclaim Defendant; | |
| and | |
| Charles Krugh, an individual, | |
| Third-party Defendant. | |

Pursuant to Rule 56.1(a) of the Local Civil Rules of the Unites States District Court for the District of New Jersey, Plaintiff Doctor's Financial Network, Inc. ("DFN") and Third Party Defendant Charles Krugh ("Krugh") submits its Statement of Disputed Material Facts in support of its Opposition to DDQ's Motion for Summary Judgment, as follows:

## STATEMENT OF DISPUTED MATERIAL FACTS

1. Plaintiff Doctor's Financial Network, Inc. ("DFN") provides insurance brokerage services and offers individual disability insurance and related products to physicians and dentists. *See* Plaintiff DFN's Responses to Defendant's Interrogatories, attached to the Declaration of Gene Markin (the "Markin Decl.") as Exhibit A, at Nos. 3, 8.

Undisputed.

2. DFN has advertised its services primarily through pay-per-click internet advertising and email campaigns. See DFN Responses to ROGs, Exh. A at Nos. 4-7.

Disputed as to "primarily" – Declaration of Charles Krugh in opposition to Defendant's motion for summary judgment ("OpDec Krugh"), ¶12.

3. DFN does not know how much money it spent on advertisements and marketing containing the Stethoscope Mark versus the Shield Logo mark. *See* Deposition Transcript of Charles Krugh dated March 23, 2023 (the "Krugh Dep"),

attached to the Markin Decl. as Exhibit B, at 107:4-17.

Undisputed.

4.  From 2004 to 2022, the vast majority of DFN's revenue has come from purchasers in California, Texas, and Florida. *See* DFN Responses to ROGs, Exh. A at No. 13; see also Krugh Dep at 113:4-15.

Objection, Relevance, FRE 401 and 403.  DFN sells policies in all fifty (50) states and it has two federal trademark registrations. OpDec. Krugh, ¶2, Ex. 124 and 125, and ¶13.  DDQ has not pleaded any concurrent use or otherwise geographic defenses. Dkt. #36.

5. Since the business started, DFN sells approximately 200 to 600 polices per year. *See* Krugh Dep. at 114:20 to 115:5.

Undisputed.

6.      Third Party Defendant Charles Krugh, CEO and owner of Plaintiff DFN, has known about White Coat Investor and its www.whitecoatinvestor.com website (the "WCI Website") for many years. *See* Krugh Dep at 59:21 to 60:8.

Objection, Relevance, FRE 401 and 403.

7. Krugh had signed up and was receiving WCI Website's newsletters since 2016. *See* Krugh Dep at 60:9-25; *see also* WCI Website Newsletters dated 2016-2018, attached to the Markin Decl. as Exhibit C (references to Bob Bhayani and DrDisabilityQuotes.com have been highlighted).

Undisputed.

8. Many of the WCI Newsletters Krugh received mentioned Bob Bhayani and DrDisabilityQuotes.com in prominent and conspicuous places, including on the first page of some newsletters under "Featured Business," such that Krugh noticed or should have noticed the competing name. *See* WCI Website Newsletters, Exh. C.

Disputed and Objection, FRE 403 and 611(a) - vague and ambiguous as to "many," "prominent" and "conspicuous."   OpDec. Krugh, ¶14 and Krugh Dep. at 59:13-15.

9. DFN and Krugh have attended several White Coat Investor trade shows. *See* Krugh Dep. at 40:14-15.

Disputed and Objection, FRE 403 and 611(a) - vague and ambiguous as to "several" and misstates his testimony.   Mr. Krugh attended *two* WCI trade shows. Krugh dep. at 40:14.

10.  Krugh "may" have seen DDQ on the WCI website. *See* Krugh Dep. at 59:13-20.

Disputed and Objection, FRE 403 and 611(a) – vague and ambiguous as to time.   Mr. Krugh testified he first learned of Mr. Bhayani and DrDisabilityQuotes in 2019.  OpDec. Krugh, ¶14 and Krugh Dep. at 59:13-15.

11.  Sometime in 2004, Krugh started using a stylized mark containing the words "Doctor Disability" with a stethoscope design in connection with disability

insurance brokerage services for doctors (the "Stethoscope Mark"):



[See Krugh Dep. at 20:13 to 21:3, 22:1-11, 24:8-15; see also Service Mark

Registration Certificate for Reg. No. 3085018, attached to the Markin Decl. as

Exhibit D.]

Undisputed.

12. The Stethoscope Mark Registration Certificate contains an explicit

disclaimer stating "NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE

'DOCTOR DISABILITY', APART FROM THE MARK AS SHOWN". *See* Service

Mark Registration Certificate for Stethoscope Mark, Exh. D.

Objection, FRE 401 and 403, relevance - *See Specialty Brands, Inc. v. Coffee*

*Bean Distribs., Inc*., 748 F.2d 669, 672, (Fed. Cir. 1984).

13. After obtaining the Stethoscope Mark registration, Krugh primarily

used the Stethoscope Mark for marketing and advertising purposes as well as used

the words "Doctor Disability" on his and Plaintiff's insurance proposals to

prospective customers. *See* Krugh Dep. at 78:4-19.

Undisputed that Krugh and DFN used the Stethoscope mark and "Doctor

Disability" in marketing and advertising and in email communications and proposals

with customers and prospective customers.  Disputed that "Doctor Disability" was used solely in proposals.  OpDec. Krugh, ¶15 and Krugh Dep. at 78:14-19 – "in email communications."

14. In 2016, Krugh uploaded an image of the Stethoscope Mark to use in connection with DFN's Google business page and is one of several pictures that are used on rotation. *See* Krugh Dep. at 29:6-21.

Undisputed that Krugh uploaded an image of the Stethoscope Mark for DFN's Google Business profile.  Objection, vague and ambiguous, FRE 403 and 611(a), as to "several." *See* Krugh Dep. at 29:6-21 – "it's one of the pictures that rotates through profiles…"

15. The picture of the Stethoscope Mark is not the first picture that comes up when someone searches for "Doctor Disability" and sees DFN's Doctor Disability Google Page. See Printout of Google Search, Dep. Exh. 16, attached to the Markin Decl. as Exhibit E; *see also* Krugh Dep at 137:3 to 138:9.

Disputed.  Krugh Dep. at 137:24-25 – "One of the pictures is the stethoscope mark."  Objection, FRE 802, hearsay and FRE 602, lacks foundation.

16. The Stethoscope Mark also appears on a YouTube video that was on DFN's website from 2015 through 2019 at which time it was removed from the website and uploaded to YouTube. *See* Krugh Dep. at 29:22 to 30:14.

Undisputed.

17. Towards the end of the YouTube video, a balloon with the Stethoscope Mark followed by .com appears for a split second. *See* Krugh Dep. at 139:22 to 140:2; see also Snapshots of YouTube Video, Dep. Exh. 17, attached to the Markin Decl. as Exhibit F.

Undisputed that the Stethoscope mark appears in the video.  Objection as to "for a split second" as grossly misstating the evidence.  The video is 120 seconds long and the Stethoscope mark is visible for 13 seconds of the video or more than 10% of the video's length.  OpDec. Krugh, ¶5, Exhibit 127 and the video is located at: https://youtu.be/pbNBN50ZTPw?si=SoEKjA_gqp1RAxcZ

18. The YouTube video is educational in nature and talks about why disability insurance is important to physicians and shows up as posted by DoctorDisability bearing the Shield Logo. *Id.*

Undisputed.

19. Despite 41,000 views, the YouTube video only has one "like." See https://www.youtube.com/watch?v=pbNBN502TPw (last visited May 1, 2024).

Undisputed.

20. According to Krugh, there is no record of anyone ever contacting DFN looking to purchase disability insurance after having watched the YouTube video. *See* Krugh Dep at 96:16 to 97:7.

Objection, FRE 401 and 403, relevance.

21. Other than the YouTube video, the Stethoscope Mark is not used in any place that has a call to action for consumers. *See* Krugh Dep at 97:8-12.

Disputed, OpDec. Krugh, ¶¶6-11, Exhibits 128-133.

22. The Stethoscope Mark is also on old brochures, business cards, stationary, envelopes and presentation folders. *See* Krugh Dep. at 30:22 to 31:7, 100:19 to 101:4.

Undisputed that the Stethoscope mark is used on brochures, business cards, stationary, envelopes and presentation folders.  Objection to characterizing the brochure as "old" as misstating Mr. Krugh's testimony.  *See* Krugh Dep. at 30:22 to 31:7, 100:19 to 101:4.

23. Passing out old business cards with the Stethoscope Mark is not part of DN's marketing practices. *See* Krugh Dep at 123:16 to 124:14.

Disputed.  Krugh Dep. at 124:5-11 – "Not very often.  I mean, so this is the card that if I meet somebody in person and they say, What do you do or do you have a card, this is the card that I give to them."

24. The Stethoscope Mark is not currently used on any active consumer facing communications such as emails. *See* Krugh Dep at 101:11 to 102:3.

Disputed.  OpDec. Krugh, ¶¶5, 7 and 11, Ex. 127, 129 and 133.

25. In 2018, DFN decided to "refresh" the look and feel of its website and revamped its Stethoscope Mark logo design. *See* Krugh Dep. at 31:16 to 33:18.

Undisputed.   However, the Stethoscope Mark was present on the website through 2019.  OpDec. Krugh, Exhibit 132.

26. As a result of that process, DFN adopted a new mark design consisting of the words "Doctor Disability" and a blue cross inside a shield design (the "Shield Logo"):



[*See* Krugh Dep. at 33:8-18.]

Undisputed.

27. After adopting the Shield Logo, DFN began using it on its website, promotional materials, and everywhere DFN had previously used the Stethoscope Mark, including on all email communications. *See* Krugh Dep. at 40:1 to 41:22, 128:8-12.

Disputed.  OpDec. Krugh, ¶¶5, 7 and 11, Ex. 127, 129 and 133.

28. After the revamping, Plaintiff has not used the Stethoscope Mark on any new marketing or advertising campaigns. *See* Krugh Dep. at 80:2 to 81:1.

Disputed.  OpDec. Krugh, ¶¶5, 7 and 11, Ex. 127, 129 and 133.

29. At time of his deposition, Krugh did not have any specific plans or intentions to ever use the Stethoscope Mark on any new marketing materials or

advertisements. *See* Krugh Dep. at 81:2-19.

Disputed.  Krugh Dep. at p. 81:8-10.

30.  DFN's website and email signature block were updated with the Shield
Logo and no longer displayed or used the Stethoscope Mark sometime between
December 17, 2018 and March 1, 2019. *See* Krugh Dep. at 147:25 to 152:25.

Disputed.  OpDec. Krugh, ¶10 and Ex. 132 – Website with Stethoscope mark
on January 7, 2019.

31. Currently, DFN uses its Shield Logo or the name Doctor Disability on
insurance proposals it submits to prospective customers and has discontinued using
the Stethoscope Mark. See Krugh Dep at 158:23 to 162:3; see also Sampling of DFN
Proposals, attached to the Markin Decl. as Exhibit G.

Disputed.  OpDec. Krugh, ¶7 and Exhibit 129.

32. At his deposition, Krugh did not have any intention to use the Stethoscope
Mark in connection with the business or the marketing and advertising of DFN's goods
and services. *See* Krugh Dep. at 170:17 to 171:9.

Disputed. Krugh Dep. at 170:21-23 – "Right now as it stands, I really like both
of my marks, and I may use both of them in the future."  OpDec. Krugh, ¶¶5-7 and
11. Exhibits 127-129 and 133.

33. In August 2018, Krugh filed a trademark registration application
seeking to register the word mark "Doctor Disability" for "insurance brokerage in

the fields of disability and life insurance." *See* Doctor Disability Trademark

Application, Dep. Exh. 18, attached to the Markin Decl. as Exhibit H.

Undisputed.

34.  Krugh did not recall reviewing the application before it was filed. See

Krugh Dep. at 144:12-17.

Undisputed.

35.  Krugh also did not understand the claim of acquired distinctiveness

that was made as part of the application. *See* Krugh Dep. at 144:18 to 146:23.

Objection, FRE 602, lacks foundation and calls for a legal conclusion.

36. Prior to submitting the application based on a Section 2(f) claim of

acquired distinctiveness, Krugh does not recall having done any type of due

diligence to determine whether anyone else was using the phrase "Doctor

Disability" for similar goods and services. *See* Krugh Dep. at 146:24 to 147:5.

Objection, FRE 401 and 403, relevance.  *Star Industries, Inc. v. Bacardi &

Co.*, 412 F.3d 373, 388 (2d Cir. 2005)("This Court has never held adoption of a

mark with no knowledge of a *prior* similar mark to be in bad faith even in the total

absence of a trademark search, much less on the basis of an allegedly flawed

trademark search")(emphasis added); A party is under no duty to conduct a search

before selecting a trademark.  *Money Store v. Harriscorp Finance, Inc.,* 689 F.2d

666, 671 (7th Cir. 1982).

37. The application claimed that the applied-for "Doctor Disability" mark had become distinctive of the insurance brokerage goods and services through the ownership of the Stethoscope Mark registration, which the application characterized as the "same mark." *See* Doctor Disability Mark Trademark Application, Exh. H to the Markin Decl.

Undisputed.

38.  The application further claimed the Doctor Disability Mark "has become distinctive of the goods/services through the applicant's substantially exclusive and continuous use of the mark in commerce that the U.S. Congress may lawfully regulate for at least the five years immediately before the date of this statement." *Id.*

Undisputed.

39. Krugh's application attests and declares that the claims of acquired distinctiveness "have evidentiary support." *Id.*

Undisputed.

40. Krugh, however, did not disclose that numerous other brokers and outfits were using the phrase "Doctor Disability" or similar in connection with the sale and offering of disability insurance to doctors. *See* Krugh Dep. at 154:12 to 157:13; see also Printouts of Competitors' Websites, Dep. Exhs. 26-28, attached to the Markin Decl. as Exhibit I.

Objection as to Exhibits 26-28, FRE 802, 901-902, lacks foundation and hearsay, and FRE 401 and 403, relevance - *See Scarves by Vera, Inc. v. Todo Imports, Ltd.*, 544 F.2d 1167, 192 USPQ 289, 294 (2d Cir. 1976) ("The significance of third-party trademarks depends wholly upon their usage. Defendant introduced no evidence that these trademarks were actually used by third parties, that they were well promoted or that they were recognized by consumers.").  Also, there is no evidence Mr. Krugh knew of any of the third parties identified at the time of his declaration to the PTO in 2018.  OpDec. Krugh, ¶16 and Krugh Dep. at 154:12 to 157:13.

41. DFN learned of a competitor using the name "Doctor Disability Shop" in 2016 and sent them a cease and desist letter in January 2018. *See* Krugh Dep. at 57:20 to 58:7; *see also* DFN Responses to ROGs, Exh. A at No. 14.

Undisputed.

42.  DFN never sued Doctor Disability Shop, which still maintains an active website and used the name Doctor Disability Shop. *See* https://doctordisabilityshop.com/ (last visited May 2, 2024); *see also* Deposition Transcript of Bob Bhayani dated May 3, 2023 (the "Bhayani Dep."), attached to the Markin Decl. as Exhibit J, at 61:22 to 62:14.

Disputed.  Krugh Dep. at 58:2-11.  Objection, FRE 802, 901-902, lacks foundation and hearsay, and FRE 401 and 403, relevance.

43. As of December 2019, there were many disability insurance providers using "Doctor Disability" or similar in connection with their business and insurance offerings. *See* Bhayani Dep. at 37:2 to 38:23; *see* also List of Competitors, Dep. Exh. 105, attached to the Markin Decl. as Exhibit K.

Disputed, Bhayani Dep. at 38:10-23 – (Q: Have you visited any of these domains? A: No.) and Objection, FRE 802, 901-902, lacks foundation and hearsay, and FRE 401 and 403, relevance.

44.  DFN does not know how many new disability insurance policies are sold to doctors every year, how much doctors spend on disability insurance premiums every year, or what share of the market DFN has. *See* Krugh Dep. at 88:23 to 89:14.

Objection, FRE 401 and 403, relevance.

45. Bob Bhayani started DrDisabilityQuotes.com ("DDQ") in October 2015. *See* Bhayani Dep., Exh. J to the Markin Decl., at 18:8-14.

Undisputed.

46. DDQ offers disability insurance and term life insurance to doctors and physicians. *See* Bhayani Dep. at 19:9-12, 46:20 to 47:9.

Undisputed.

47. DDQ began using its DrDisabilityQuotes.com Mark (reproduced below) (the "DDQ Mark") since November 2015 when its website went live:

- 14 -



[See Bhayani Dep. at 31:10 to 32:2, 41:2-19; see also Snapshot of DDQ

Website, Dep. Exh. 107, attached to the Markin Decl. as Exhibit L.]

    Undisputed.

    48. DDQ has heavily advertised on the WCI Website since January 2016

through various channels including sponsored daily posts, sponsored podcasts,

Facebook group sponsorships, newsletter sponsorships, and Platinum educational

sponsorship enabling DDQ to write and post articles on the WCI Website. *See*

Bhayani Dep. at 21:19 to 22:20, 64:8-10, 127:19 to 131:22.

    Undisputed as to the advertising methods listed.  Objection as to the term

"heavily" per FRE 901, 902 – lack of foundation and misstating Mr. Bhayani's

testimony as the number of views, dollars spent, and consumer impact are not

identified in the testimony cited.

    49. DDQ spends about $400,000 per year on advertising and sponsorships

related to the WCI Website. *See* Bhayani Dep. at 131:23 to 132:13.

    Undisputed.

50. Since January 2016, DDQ has been on the WCI Website's list of 10 preferred disability insurance providers. *See* Bhayani Dep. at 64:8 to 65:19.

Undisputed.

51. Approximately 60-70% of DDQ's business and customers come from the WCI Website. *See* Bhayani Dep. at 64:5-7.

Undisputed.

52. DDQ sells approximately 1000 polices per year. *See* Bhayani Dep. at 76:8.

Undisputed.

53. DDQ spends $400,000 - $500,000 on advertising per year. *See* Bhayani Dep. at 132:14 to 133:6.

Undisputed.

54. DFN has experienced many customers contacting DFN looking for Bob Bhayani and/or DDQ. *See* Krugh Dep at 110:15 to 111:6.

Undisputed.

55. Instead of referring these customers to DDQ, DFN capitalizes on the confusion and attempts to sell them a policy. *See* Krugh Dep at 111:10 to 112:6.

Objection, FRE 401 and 403, relevance.

56. In fact, DFN has received numerous web inquiries from consumers

looking for DDQ. *See* Krugh Dep. at 157:14 to 158:22; *see also* Screenshot of WCI Facebook Group Post by Consumer, Dep. Exh. 114, attached to the Markin Decl. as Exhibit M.

Undisputed.

57. DDQ has received written and verbal complaints from customers about DFN pretending to be DDQ in order to secure the customers' business. *See* Bhayani Dep. at 68:2 to 71:20, 76:25 to 78:16, 99:14 to 104:15; see also Customer Complaint re DFN, Dep. Exh. 115, attached to the Markin Decl. as Exhibit N.

Disputed, Decl. of Krugh, ¶17.  Objection, FRE 802, hearsay and FRE 602, lacks foundation.

58. DDQ and DFN sell the same type of products to the same target market. *See* Bhayani Dep. at 81:1-22.

Undisputed.

59.  In connection with this lawsuit, DDQ commissioned a consumer survey study to determine whether consumers of disability insurance for doctors perceived the mark "DOCTOR DISABILITY" as a source indicator attributable to one service provider. *See* Expert Report of Mark Keegan without Exhibits (the "Keegan Report"), attached to the Markin Decl. as Exhibit O.

Disputed, OpDec. Gray, Ex. 133 – Dr. Pittaoulis' report.  Objection, FRCP, Rule 26 and 37(c)(1) - DDQ's untimely disclosure bars the use of the expert report

and survey.  *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.,* 259 F.3d 1101, 1106

(9th Cir. 2001); *Newman v. GHS Osteopathic, Inc., Parkview Hosp. Div.,* 60 F.3d

153, 156 (3d Cir. 1995).

60. The study involved 415 doctors in the market for disability insurance

and concluded that the name "DOCTOR DISABILITY" had acquired "no level of

secondary meaning - i.e., zero percent - among the relevant population of doctors in

the market for disability insurance." *See* Keegan Report at pp. 3, 13-16, 11 7, 46-53.

Disputed, OpDec. Gray, Ex. 133 – Dr. Pittaoulis' expert report.  Objection,

FRE 401 and 403, relevance, survey was not conducted regarding consumers of

insurance brokerage services - Ex. 131 and Keegan depo. p. 24, ll. 1-7 and FRE

702, improper opinion, Mr. Keegan's report and survey fail to conform to reliable

principles and methods.  *See, e.g.,* Ex. 133, ¶¶24-32, 33-40 and 42.


**ADDITIONAL FACTS IN SUPPORT OF**

**OPPOSITION TO SUMMARY JUDGMENT**

1.      Plaintiff and Counterdefendant Doctor's Financial Network, Inc.

("DFN") is the owner of U.S. Trademark Reg. Nos. 3,085,018 ("the '018

registration") for "DOCTOR DISABILITY" (+design) for insurance brokerage

services.  (OpDec. Krugh, ¶2, Exhibit 124.)

2.      The '018 registration became incontestable per 15 U.S.C. §1065 and

§1115(b) in June of 2011.  (Dkt. #54-2, Decl. of Krugh, ¶12, Exhibits 134 and 135.)

  3. DFN is the owner of U.S. Trademark Reg. No. 5,744,284 ("the '284 registration") for DOCTOR DISABILITY for insurance brokerage services. (Dkt.#54-2, Decl. of Krugh, ¶2, Exhibit 125.)

  4. Defendant DDQ admits that the parties' marks are confusingly similar in its pleadings.  (Dkt. #36, ¶¶25, 33, 66, 69.)

  5. Mr. Bhayani admits there is "all this confusion" between the parties' marks.  (DDQ depo. transcript, p. 73, ll. 20-21.)

  6. There is actual confusion between the parties' marks.  (DDQ depo. transcript, pp. 75-77, 80, 99-100 and Ex. 115; Dkt.#54-2, Decl. of Krugh, ¶3 and Ex. 126.)

  7. The parties have the same types of customers and potential customers. (DDQ depo. transcript, p. 81, ll. 17-22.)

  8. The trademark application that became the '284 registration was filed on **August 29, 2018**.  (Dkt. #54-2, Decl. of Krugh, Ex. 125.)

  9. The Stethoscope mark was incontestable and in use on **August 29, 2018**.  (Dkt. #54-2, Decl. of Krugh, ¶12, Exhibits 134 and 135; Decl. of Krugh, ¶¶4-11, Ex. 127-133 and DFN depo. transcript, pp. 29-32.)

  10. The Stethoscope mark is conclusively proven to have secondary meaning and acquired distinctiveness.  *See Fisons Horticulture, Inc. v. Vigoro*

*Industries*, 30 F.3d 466, 472 (3d Cir. 1994)(citing *Ford Motor Co. v. Summit*

*Motor Products, Inc.*, 930 F.2d 277, 291 (3d Cir. 1991)); *Park 'N Fly, Inc. v.*

*Dollar Park & Fly, Inc.*, 469 U.S. 189, 205 (1985).

11.    Mr. Krugh was both subjectively and objectively justified in

believing and stating to the PTO that his DOCTOR DISABILITY trademark in

the '018 registration had acquired distinctiveness as of August 29, 2018.  (Dkt.

#54-2, Decl. of Krugh, ¶12, Exhibits 134 and 135; Decl. of Krugh, ¶¶4-11, Ex. 127-

133 and DFN depo. transcript, pp. 29-32.)

12.    DDQ has admitted to the likelihood of confusion between the parties'

and the existence of actual confusion and, therefore, DDQ admits that the

DOCTOR DISABILITY trademark has acquired distinctiveness/secondary

meaning.  (*See, e.g.,* DDQ depo. transcript, p. 80 and Dkt. 36, ¶¶25, 33, 66, 69.)

13.    DFN has substantial evidence of trademark infringement damages.

DDQ Depo., pp. 109-122 (authenticating 2017 to 2021 tax returns – Ex. 117-122)

and p. 122, ll. 7-14; Depo. of Rogers, p. 46, ll. 4-8 and OpDec. Gray, Ex. 142, p. 2

– Table 1 and p. 5, Table 2.

14.    Mr. Bhayani authenticated his and/or DDQ's tax returns for 2017 to

2021 showing gross revenues from infringing sales of services.  DDQ Depo. pp.

109-122, p. 122:7-14 and Exhibits 117-122.

15.    Mr. Bhayani also provided a sworn interrogatory response providing

- 20 -

DDQ's revenue under the infringing mark.  OpDec. Gray, Ex. 143, Supplemental Response to Interrogatory No. 15.

16.    DDQ's damages expert, Graham Rogers, admitted there were damages stemming from DDQ's infringement.  Ex. 142 - Rogers, ¶66; Depo. of Rogers, p. 68, ll. 8-15.

17.     There is evidence of actual confusion between the parties' marks. (DDQ depo. transcript, pp. 75-77, 80, 99-100 and Ex. 115; Dkt.#54-2, Decl. of Krugh, ¶3 and Ex. 126.)

18.    The trademark in the '118 registration, referred to as "the Stethoscope mark," has been in continuous use from at least as early as 2004 to the present and has not been abandoned.  (Dkt. #54-2 - Decl. of Krugh, ¶¶4-11, Ex. 127-133 and DFN depo. transcript, pp. 29-32.)

19.    Defendant's Rule 26 disclosure of Mr. Keegan, his report and his survey were not served until August 25, 2023.  OpDec. Gray, ¶5 and Ex. 150.

\\

\\

\\

\\

\\

20.     DFN and DDQ are not insurance providers and do not provide the

same services as insurance providers.  DDQ Depo. p. 47:15-19 and Keegan Depo.

pp. 24-25.

Respectfully submitted,

**Law Offices of Peter J. Lamont**

Dated: <u>June 7, 2024</u>

_____/s/ Peter J. Lamont_____
Peter J. Lamont
191 Godwin Avenue, Suite 4
Wyckoff, NJ 07481
Telephone: (201) 904-2211
Email: pl@pjlesq.com

**Mandour & Associates, APC**

Dated: <u>June 7, 2024</u>

Ben T. Lila (CA SBN 246808), *pro hac vice*
8605 Santa Monica Blvd., Suite 1500
Los Angeles, CA 90069
Telephone: (858) 487-9300
Email: blila@mandourlaw.com

Attorneys for plaintiff and counterclaim-defendant,
Doctor's Financial Network, Inc. and third-party
defendant Charles Krugh

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on the below, copies of the foregoing document was filed electronically via the Court's CM/ECF system.  Notice of these filings will be sent to all attorneys of record by operation of the Court's Electronic Filing System.

**Law Offices of Peter J. Lamont**

Dated: <u>June 7, 2024</u>

<u>        /s/ Peter J. Lamont        </u>
Peter J. Lamont
191 Godwin Avenue, Suite 4
Wyckoff, NJ 07481
Telephone: (201) 904-2211
Email: pl@pjlesq.com

Attorneys for plaintiff and counterclaim-defendant, Doctor's Financial Network, Inc. and third-party defendant Charles Krugh

- 23 -